IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

MIKE MINH NGUYEN,

    Petitioner,

v.

MATTHEW CATE,

    Respondent.

No. C 09-03980 JSW

**ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS**

## INTRODUCTION

Petitioner Mike Minh Nguyen, a California state prisoner, filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254. On December 23, 2009, this Court issued an order to show cause. Respondent filed an answer on February 22, 2010, and on March 22, 2010, Petitioner filed a traverse. The Court hereby DENIES the petition for a writ of habeas corpus on the merits.

## BACKGROUND

A jury in Santa Clara County convicted Petitioner of three counts of aggravated assault of a child under the age of 14 under California Penal Code § 269, and four counts of forcible lewd or lascivious act on a child under California Penal Code § 288(b)(1). On March 20, 2006, the trial court sentenced Petitioner to state prison for 45 years to life, plus 24 years. Petitioner appealed, and on February 19, 2008, the California Court of Appeal found insufficient evidence with respect to one count of forcible conduct, and reduced that count to a lesser included offense, California Penal Code § 288(a). The Court or Appeal otherwise affirmed the judgment.

On June 11, 2008, the California Supreme Court denied review.

The Court of Appeal of the State of California, Sixth Appellate District, summarized the facts underlying the conviction as follows:

> In July 2004, during the summer between second and third grade, eight-year-old Sandy met appellant when she was at a Vietnamese restaurant with her mother, Tuyet. Tuyet and appellant began dating and appellant spent almost every night at Tuyet's apartment.
>
> On October 17, 2004, Sandy came to Rene Veitch's office at the North Valley Baptist Church Sunday School. Veitch was to talk to Sandy about baptism and salvation. Veitch testified that when she told Sandy that "God forgives us for all our sins," Sandy asked her "if God would forgive people for hating people." Veitch asked Sandy whom she hated and Sandy said that she hated her mother's boyfriend. Sandy said that sometimes he did "bad things" to her. She told Veitch, "He does this one thing that I can't tell anyone." Sandy said that she had told her mother but that her mother did not believe her. She then spelled out the word "sex." Sandy returned to Sunday school class and Veitch reported this disclosure to her supervisor Ginger Baines. Baines then spoke to Sandy in the chapel with Veitch present. Baines reported to the pastor Mike Zachary who contacted the police.
>
> Later that day, San Jose police officers went to Tuyet's home, explained why they were there, and asked to speak to Sandy While Officer Desiree Thompson talked to Sandy in Sandy's room, Tuyet yelled something in Vietnamese into the room that Sandy said meant, "Don't say too much." Nevertheless, Officer Thompson found Sandy "surprisingly forthcoming." Sandy told Officer Thompson that in the first incident with appellant, he put his hands up her shirt and was touching her chest. When she asked him if she could just go to sleep, he "told her to 'shh.'" Thompson testified that Sandy told her that this had happened "multiple times" and also described "contact between [appellant] and her vagina."[1] Sandy was taken to the Children's Shelter.
>
> On October 19, 2004, San Jose Police Detective Ken Tran interviewed Sandy at the children's interview center. Although as a member of the sexual assault unit Detective Tran had received training in "the appropriate ways of interviewing children who are alleging sexual abuse," he testified that "Sandy was my very first." A DVD of the interview was played for the jury and the jurors were given transcripts as well. In the interview, Sandy told Tran that she had a problem with "sex" in that appellant "does it on me instead of my mom." She said, "I don't think kids get this problem a lot. They shouldn't."
>
> Sandy appeared uncomfortable and embarrassed during the interview, sometimes putting her head down on the table and speaking softly, sometimes shouting her answers in an

---

[1] When the prosecutor asked Officer Thompson, "What did [Sandy] say was the nature of that contact?" the court sustained defense counsel's hearsay objection and the question remained unanswered.

2

exasperated tone. Tran showed her diagrams of a boy and a girl and had her identify body parts. Sandy covered her mouth with her hand and spelled some of her answers rather than speaking words. Toward the end of the interview, when Tran said that he wanted to "clarify some stuff," Sandy complained that Tran "made me say it thousand times, two times or three, or four."

Sandy told Tran that appellant put his mouth on her chest every time he came over except for those times when she arrived home when he was about to leave. She said that this happened at night in the room where she watched television while her mother was in the kitchen, taking a shower, or drying her hair. Sandy said that "sexual abuse is not the only thing. Her "other problem" was appellant slapping her twice, scratching her by accident, and "biting [her] butt."

Sandy told Tran that when appellant would put his mouth on her body, she would tell him, "Get off, get off" and he would tell her to "shush." She would tell him to stop but "he didn't respond."

Sandy pointed to the male private part on the diagrams and said "it's all a part of my problem." Tran asked her to tell him about that, and she said, "But I can show you. I'm not telling you." She took the diagrams and gestured with them saying "He put his private ... on my privates." When appellant would put his private on the "middle" of her "butt area" she would yell "Aaah" and try to push him. Once she rolled over and kicked him. Her hands were "stuck" because appellant was holding them.

Tran asked Sandy if she had seen appellant's private part and asked her to describe it. She said, "Medium. I mean, short and long, well not long, but short .... Half of it was reddish and pinkish .... And the other side was brownish and grayish .... And on the front was reddish and it had, I think it had a hole .... Little one." Tran asked Sandy to describe how it felt when his private was "on top" of her private. She said it felt "Wiggly .... And uppy and down." She also described it as "Squishy." Sandy told Tran that appellant's penis "kept pushing mine. In the privates." She said that it was "Outside."

Tran asked Sandy what she was wearing when appellant kissed her private parts and she said that "one time I was wearing a gymnastics suit, two times I was wearing pants, and um, for the rest of the times I was wearing shorts." Sandy asked Tran to "Write this down so I don't have to say that again."

Sandy told Tran that appellant slapped her and stuck out his tongue at her when she told him to "go home." Sandy said that she had not seen anything come out of appellant's private part but that when it was "in [her] private part" she could feel "Something wet." Tran asked Sandy, "How did you know [his private part] was in you? In your private part?" Sandy said, "I felt it." She said that it felt "Ugly" and "scrunchy."

At trial, Sandy testified that she usually slept in the same bed as her mother because that made her feel safe. Later, she slept with appellant and her mother in the same bed. She said that she "never slept just with [appellant.]"

3

The first time appellant came to her home they played games on the computer. The first time appellant did something to Sandy's body that she did not like she was playing a computer game with him in the bedroom while her mother was in another room. Sandy was sitting on appellant's lap. Although Sandy answered multiple times that she would "rather not say" what appellant did to her, she said that appellant put his hand underneath her top and was "pressing" and "squishing" for "two or one minutes." He pinched her nipples. After that, she was on her bed and he put his mouth on her chest. She could feel the weight of his body on top of her. After the first incident, appellant put his mouth on her chest more than five times.

Sandy testified at trial that appellant touched his number one private to her number one private "More than one time." She said his number one private would touch the outside of her private. They were wearing clothing but appellant had the zipper on his pants open. She demonstrated with dolls how appellant would lay on top of her. She said that he was moving his number one part. Sandy testified that this usually happened in the evening, that it happened more than five times, and that it happened "mostly" when her mother was home cooking or blow drying her hair. Appellant told Sandy not to tell her mother because "It wouldn't be fun." Sandy showed her mother red marks on her chest left by appellant. Sandy said that she told her mother "Once or twice" that appellant was "doing bad things" to her. When her mother did not believe her, Sandy felt "kind of" upset because, "She should have believed me because I wouldn't lie about this."

Sandy testified that appellant touched her number two private part with his number one private part more than five times over clothing.

In an effort to keep appellant from coming into the bedroom, Sandy taped signs on the bedroom door. These signs were introduced into evidence. Some had drawings of a skull and crossbones. The signs said, "No men," "Stay out," "Don't come in or else," and "Keep out." The signs did not keep appellant from coming into the bedroom.

After appellant started touching Sandy, she began to feel a stinging pain in her number one private part. She thought appellant was causing the stinging or maybe it was caused by not being clean enough. To try to make the stinging stop, she put a wet Q-tip on the inside of her number one private part. She put it in "Not that very far." Her mother walked by the bathroom and asked her what she was doing. Her mother wanted her to go to a doctor.

Sandy testified that she told her teacher at Sunday school what appellant was doing to her because "I couldn't just keep it inside and ... just thought I had to tell somebody." When the police came and took her to the Children's Shelter, she felt safer.

The prosecutor introduced into evidence portions of Sandy's preliminary examination testimony. The first passage concerned how many times appellant had touched Sandy's chest. Sandy had testified at trial that appellant touched her chest once, but at the preliminary hearing she had answered "yes" to the question "He did it more than once?"

4

During the preliminary examination testimony Sandy was asked, "When Mike tried to put his private part into your front private part, did it ever touch the skin of your private part?" and she answered, "Two times." Sandy also testified at that hearing that when appellant touched her "back private part" with his "private part" it "just pushed in." She answered "Yes" to the question "It just pushed in? Was the skin of his private part touching the skin of your back private part when that happened?"

Tuyet, Sandy's mother, testified at trial that she sold nutrition products out of her two-bedroom condominium. She said that about a week after meeting appellant, she invited him to dinner at her home. After dinner, Sandy went to sleep in the smaller bedroom. At one point, Tuyet thought appellant was in the restroom, but when she walked past the bedroom she saw appellant sitting on the bed at Sandy's feet watching her sleep. Tuyet asked appellant to leave the room. Tuyet lay down next to Sandy, and appellant lay down next to them until he left around 2:00 a.m.

Tuyet and appellant started dating and he came to her home almost daily. When he spent the night, appellant would sleep in the same bed as Tuyet and Sandy. Appellant wanted Sandy to sleep in the middle. Tuyet would not allow this and she slept in the middle. Tuyet testified that appellant, whom Sandy called Uncle Mike, was more interested in being with Sandy than with her and closer to Sandy than to her. After Tuyet had been dating appellant for about three weeks, Sandy complained to her that "Uncle Mike [is] being lewd with me." Tuyet testified that Sandy complained that "Uncle Mike put his hand under her shirt and touched her chest." Sandy showed Tuyet hand prints and marks on her body. Tuyet testified, "I asked Mike whether he had done that .... He said no." Later, Sandy complained to Tuyet that "Uncle Mike was lying on top of her body."

When Tuyet was sick, appellant said that Sandy would get sick if she slept with her, so Sandy and appellant slept in the other bedroom. Another time, Tuyet came out of the bathroom to find appellant bent over Sandy kissing her on the cheek while she slept. Tuyet testified that Sandy threw water at appellant and threw his pants out the window. When Tuyet found Sandy in the bathroom with the Q-tip, Sandy complained to her that "the opening to her body was burning." Tuyet saw that it was red. Tuyet said that she wanted to take Sandy to the doctor but that Sandy was embarrassed and refused to go.

In August 2004, Tuyet went to Vietnam for 19 days. She arranged for Sandy to stay with a friend, and gave appellant permission to pick Sandy up from school. Tuyet said that appellant "exert[ed] coercion" on her to get her to agree to this. Tuyet brought her grandmother back from Vietnam to live with her and Sandy. When she returned, she saw appellant a few more times and he only stayed over once more.

Around the time Tuyet stopped dating appellant, she learned that he had been dating another woman whose name was Thuan. Tuyet spoke to Thuan on the telephone several times and went to Thuan's home with Sandy once. When asked at trial why she continued to date appellant when Sandy had complained to her about his conduct, Tuyet answered, "I don't know anymore."

5

Physician's Assistant Mary Ritter testified as an expert "in the area of child sexual assault examinations and in pattern of injury in those cases." She examined Sandy on October 20, 2004. Ritter testified, "Normally, the bottom portion of the hymen is the widest portion, and in [Sandy's] case, there was very little hymen in that bottom portion." She said that the "likely cause" of the appearance of Sandy's hymen was "a penetrating event." She said that "some hard object has penetrated through that opening and has torn it, and it's healed, but it has left that narrow, narrow edge .... [I]t's possible it could have been a penis, it could have been a finger, it could have been some sort of another object, but it's ... something that actually went between the labia and penetrated through the opening and tore the -- that bottom portion of the hymen when it penetrated." In contrast to hymeneal tissue, anal tissue "heals completely about two weeks after a penetrating injury." Ritter testified that Sandy's hymeneal tear was "well-healed" and that, after a penetrating injury, "it takes at least a couple of weeks for the bruising to all go away and the swelling to go away." Ritter also observed that Sandy had a skin condition on the outside of her vaginal area that causes itching, burning, and tissues that bleed more easily, but has nothing to do with sexual abuse.

Criminalists testified about the results of DNA testing on bedding taken from Sandy's home. Of the five semen stains found, none contained bodily fluids from Sandy. Three semen stains contained mixtures of appellant's and Tuyet's body fluids, one was a mixture of two females, and one was appellant's semen.

*People v. Nguyen*, No. H030366, slip op. at 1-8 (Cal. Ct. App. Feb. 19, 2008).

## STANDARD OF REVIEW

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a federal habeas court may grant a petition challenging a state conviction or sentence on the basis of a claim that was "adjudicated on the merits" in state court only if the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* § 2254(d).

Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially

6

indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case. *Id.* The federal habeas court may also grant the writ if the court has the "firm conviction" that the state court made an unreasonable determination of the facts in light of the evidence. *Torres v. Prunty*, 223 F.3d 1103, 1108 (9th Cir. 2000). A federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411. Rather, to support granting a writ, the state court's application of federal law must be "objectively unreasonable." *Id.* at 409; *accord Middleton v. McNeil*, 541 U.S. 433, 436 (2004) (per curiam) (holding that a challenge to a state court's application of governing federal law must not only be erroneous, but objectively unreasonable); *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam) (holding that an "unreasonable" application of law is not equivalent to an "incorrect" application of law).

The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is the holdings of the Supreme Court as of the time of the state court decision. *Williams*, 529 U.S. at 412; *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003). While the United States Circuit Courts may provide "persuasive authority" for the purposes of determining whether a state court decision unreasonably applies Supreme Court precedent, only the Supreme Court's holdings bind the state courts and only those holdings need be "reasonably" applied. *Clark*, 331 F.3d at 1069.

If the state court decision only considered state law, the federal habeas court must ask whether state law, as explained by the state court, is "contrary to" clearly established governing federal law. *Lockhart v. Terhune*, 250 F.3d 1223, 1230 (9th Cir. 2001); *see also Hernandez v. Small*, 282 F.3d 1132, 1141 (9th Cir. 2002) (finding the state court applied correct controlling authority when it relied on a state court case for a proposition squarely in accord with controlling Supreme Court authority). If the state court, relying on state law, correctly

7

1  identified the governing federal legal rules, the federal court must ask whether the state court
2  applied them unreasonably to the facts. *See Lockhart*, 250 F.3d at 1232.
3       Petitioner alleges four grounds on which the habeas petition should be granted: (1) trial
4  counsel provided ineffective assistance of counsel by failing to present a defense or the
5  testimony of the petitioner, as promised in the opening statement; (2) the evidence was
6  insufficient to support the jury's findings of two counts of rape and one count of sodomy; (3)
7  the trial court improperly admitted preliminary hearing testimony; and (4) the prosecution's
8  closing argument impermissibly exposed the jury to facts not in evidence.

### A. Petitioner's Trial Counsel Was Not Ineffective.

Petitioner alleges that his trial counsel was ineffective because he did not present a defense, and Petitioner did not testify as counsel promised in his opening statement. In his opening, defense counsel stated that Petitioner "Mike Nguyen did not do this to [Sandy]." (Respondent's Answer, Exhibit E ("Ex. E") at 12.) Defense counsel also stated that Petitioner "will testify about these things that I'm telling you." (*Id.* at 13.) Defense counsel then described to the jury how Petitioner and Tuyet met, how Sandy was afraid of sleeping alone, and how Sandy became angry with Petitioner when she learned he was cheating on her mother. (*Id.* at 11-16.) While the defense did not intend "to prove or disprove in any way that Sandy wasn't molested," counsel asked the jury to "listen to the evidence ... because Mike Nguyen did not perpetrate these horrific acts which caused Sandy's injuries." (*Id.* at 12, 16.) At the close of the prosecution's case, the defense rested without putting Petitioner or any other witnesses on the stand. (Respondent's Answer, Exhibit F ("Ex. F") at 615.) In his closing, defense counsel emphasized the weakness of the evidence, and asked the jury to find that, based on the contradictory and inconclusive testimony presented by Sandy and other witnesses, the State failed to meet its burden to prove every element of the charges beyond a reasonable doubt. (*Id.* at 699-701.) Petitioner contends that defense counsel's decision not to present the defense promised in his opening statement violated Petitioner's Sixth Amendment right to effective assistance of counsel.

8

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *Id.* In order to prevail on the Sixth Amendment ineffective assistance of counsel claim, a petitioner must establish two things. *Id.* at 687. First, he must establish that counsel's performance fell below an "objective standard of reasonableness" under prevailing professional norms. *Id.* at 687-88. Second, he must establish that counsel's deficient performance prejudiced the outcome and that "there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different." *Id.* at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* A federal habeas court considering an ineffective assistance claim need not address the prejudice prong of the *Strickland* test if the petitioner has not established incompetence under the first prong. *Siripongs v. Calderon*, 133 F.3d 732, 737 (9th Cir. 1998).

Judicial scrutiny of counsel's performance is highly deferential and a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *See Strickland*, 466 U.S. at 689; *Wildman v. Johnson*, 261 F.3d 832, 838 (9th Cir. 2001). The Court does not find ineffective assistance of counsel resulting from a difference of opinion as to trial tactics, *United States v. Mayo*, 646 F.2d 369, 375 (9th Cir. 1981), nor do tactical decisions constitute ineffective assistance simply because, in retrospect, the Court recognizes that better tactics were available. *Bashor v. Risley*, 730 F.2d 1228, 1241 (9th Cir. 1984). Tactical decisions of trial counsel deserve deference when counsel's decision appears reasonable under the circumstances. *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994).

For example, in *United States v. Crawford*, the Eastern District of California denied petitioner's writ of habeas corpus for ineffective assistance of counsel where the defense counsel failed to produce a witness promised in the opening statement. 680 F. Supp. 2d 1177, 1200 (E.D. Cal. 2009). The jury convicted Crawford of murder and numerous other charges

9

related to a racketeering conspiracy. *Id.* at 1180-81. In the opening statement, defense counsel spoke at length about how a specific witness, William Noel, would testify and prove that Crawford was framed for the murder. *Id.* at 1197-98. Despite the specificity and detail of the promises made in the opening statement, defense counsel did not subpoena Noel, and Noel never offered the promised testimony. *Id.* at 1198. However, the court found that defense counsel made a reasonable tactical decision not to put Noel on the stand because Noel had serious credibility problems, making him "impeachable, disreputable, and incredible." *Id.* at 1200, 1202. In light of these credibility problems, the strategic decision not to put Noel on the stand was objectively reasonable, and therefore did not constitute ineffective assistance of counsel. *Id.* at 1202.

While there are no Ninth Circuit Court of Appeals cases directly on point regarding claims of ineffective assistance of counsel arising from broken promises made in opening statements, many other circuits have addressed the issue. As a general rule, courts presume that counsel's decision not to present promised evidence is reasonable, though the court must view the decision "in light of all the circumstances." *Strickland*, 466 U.S. at 689-690. *See, e.g.*, *McAleese v. Mazurkiewicz*, 1 F.3d 159, 167, 170 (3rd Cir. 1993) (finding no ineffective assistance of counsel where the defense's opening statement did not specifically promise an alibi defense, and where the alibi witness who did not testify would have been subject to potentially damaging cross-examination); *United States v. McGill*, 11 F.3d 223, 227 (1st Cir. 1993) (finding no ineffective assistance of counsel where the defense did not present expert testimony promised in the opening statement because of impeachment concerns, but was able to elicit similar evidence through cross-examination). However, some courts have found ineffective assistance of counsel where the defense fails to present evidence or witness testimony promised in opening statements on the grounds that not fulfilling such a promise prejudicially disappoints juror expectations. *See, e.g.*, *Ouber v. Guarino*, 293 F.3d 19, 22, 29 (1st Cir. 2002) (finding ineffective assistance of counsel where the defense did not present petitioner's testimony after promising it four times and emphasizing the testimony's importance, and where no unforeseeable events justified the change in strategy); *Anderson v.*

10

*Butler*, 858 F.2d 16, 18-19 (1st Cir. 1988) (finding ineffective assistance of counsel, and prejudice as a matter of law, where the defense did not present testimony promised in the opening statement and where there was no justification for the change in trial strategy).

In this case, the California Court of Appeals found that, in light of all the circumstances, defense counsel's decisions not to present a defense and not to put Petitioner on the stand, as promised in the opening statement, were reasonable and did not amount to ineffective assistance of counsel, nor did defense counsel's failure to fulfill these promises prejudice the jury. The court reasoned that defense counsel had elicited the necessary evidence through cross-examination and made a reasonable tactical decision, based on the perceived weakness of the evidence before the jury, not to present the promised testimony and defense. *Nguyen*, No. H030366, slip op. at 13. In particular, defense counsel's decision not to offer Petitioner's testimony was reasonable because cross-examination of him posed considerable risks. *Id.* Specifically, Petitioner had made some "extremely damaging" statements to the police about past allegations of misconduct with the daughters of other women he had dated. *Id.* n.2. Given the perceived weakness of the evidence before the jury, and the risk posed by putting Petitioner on the stand, the defense made a reasonable tactical decision to rely on the argument that the prosecution failed to meet its burden of proof. *Id.* at 13.

The court concluded that:

Reasonably competent counsel could have determined after hearing the prosecution's case that the prosecution's witnesses, whether because of the extent of their inconsistent statements or their demeanors on the stand, were less convincing than even well prepared defense counsel would have anticipated at the time of the opening statements. Based on this assessment reasonably competent counsel could have determined that counsel's summation ought to be limited to inviting the jury to consider whether the prosecution actually had met its burden of establishing guilt beyond a reasonable doubt.

Nor is it a foregone conclusion that the "jury would have assumed that appellant had changed his mind about testifying based on the damaging evidence presented." This conclusion could only be reached by ignoring defense counsel's explanation during closing argument of the concept of reasonable doubt. Counsel said "if you sat [here] and thought about, 'I don't know what happened here. There's been so many contradictory statements by Tuyet, by Sandy, and by Detective Tran ... and do I really know that Mary Ritter is absolutely right about the fact that a Q-tip can't cause this injury, then I'm confused,' because you have to be sure." This explanation served to

11

>highlight the weaknesses in the prosecution's case, and reinforce the concept that the defense need not present evidence. Defense counsel provided competent assistance.

*Nguyen*, No. H030366, slip op. at 14-15.

In light of all the circumstances, including the inconsistencies in the evidence, the risk of exposing Petitioner to cross-examination, and the testimony defense counsel elicited through cross-examination, defense counsel made a reasonable and strategic decision to rely on the weakness of the evidence to exonerate Petitioner rather than presenting Petitioner's promised testimony. *See Strickland*, 466 U.S. at 689-690. Because defense counsel's decision was reasonable in light of the circumstances, the California Court of Appeal's finding is not an unreasonable application of the ineffective assistance of counsel standard articulated in *Strickland*. In addition, because Petitioner has failed to prove counsel's representation was objectively unreasonable, the Court need not address *Strickland*'s prejudice prong. *See Siripongs*, 133 F.3d at 737 (holding that where counsel's representation is determined to be competent, the court need not address the prejudice prong of *Strickland*).

**B.     The Evidence Was Sufficient to Support the Jury's Findings.**

Petitioner challenges the sufficiency of evidence to sustain his conviction for two counts of rape and one count of sodomy. Specifically, Petitioner argues that the evidence of penetration is insufficient to support the jury's findings.

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). In reviewing a habeas petition for a prisoner who alleges insufficiency of evidence to support his conviction, the federal court must determine whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The reviewing court may sustain a conviction based on circumstantial evidence and inferences drawn from the evidence presented to the trier of fact. *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir. 1995).

If confronted by a record that supports conflicting inferences, a federal habeas court

12

"must presume - even if it does not affirmatively appear on the record - that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson*, 443 U.S. at 319. The court must therefore give a jury's credibility determinations near-total deference. *Bruce v. Terhune*, 376 F.3d 950, 957 (9th Cir. 2004). Except in the most exceptional of circumstances, *Jackson* does not permit a federal habeas court to revisit credibility determinations. *See id.* at 957-58 (holding that where the jury's finding of guilt depend on a credibility determination between a victim alleging sexual molestation and a defendant vehemently denying allegations of wrongdoing, the court has no basis for revisiting the jury's credibility determination); *see also People of the Territory of Guam v. McGravey*, 14 F.3d 1344, 1346-47 (9th Cir. 1994) (upholding conviction for sexual molestation based entirely on uncorroborated testimony of the victim).

### 1. The Evidence Was Sufficient to Support the Jury's Finding of Two Counts of Rape.

Petitioner does not dispute that the evidence is sufficient to support a finding of one count of aggravated assault on a child under the age of 14 years by rape pursuant to California Penal Code § 269. However, he contends that there is insufficient evidence of more than one act of penetration sufficient to support the second count of rape. Petitioner argues that the evidence presented at trial "proves only contact with the outside of her genitals, but it does not prove additional penetration." (Petition for Writ of Habeas Corpus ("Petition") at ¶ 65.) Petitioner also argues that there is insufficient evidence of penetration because when Sandy said she "felt the sensation of something wet 'inside' her private spot ... Sandy was not asked to describe what she meant by 'inside.'" (*Id.*)

The Court evaluates Petitioner's arguments in light of *Jackson*, and will grant habeas relief only where, when the evidence is viewed in the light most favorable to the prosecution, a rational trier of fact could not have found more than one act of penetration beyond a reasonable doubt. *Jackson*, 443 U.S. at 319. California law defines sexual penetration as contact with any external female genitalia "inside the exterior of the labia majora," and does not require actual vaginal penetration. *People v. Quintana*, 89 Cal. App. 4th 1362, 1366-69 (2001). "Any sexual

13

1  penetration, however slight," is sufficient to support a finding of rape. Cal. Penal Code § 263.

2  At trial, both Sandy and the medical expert presented testimony regarding penetration.
3  Dr. Ritter, the medical expert, examined Sandy shortly after Sandy told detective Tran that
4  Petitioner had "put his private on [her] private" the previous Wednesday. (Respondent's
5  Answer, Exhibit D ("Ex. D") at 24-26, 36.) Dr. Ritter testified that Sandy had a tear in her
6  hymen from a penetrating event. (Respondent's Answer, Exhibit B ("Ex. B") at 8.) This injury
7  takes several weeks to heal, and at the time of examination, the injury was "well-healed." (*Id*.)
8  Sandy testified that Petitioner's penis touched her genitals more than one time and that twice
9  there was skin-on-skin contact. (Ex. F at 363, 610.) Sandy also told Detective Tran that when
10 Petitioner's penis was "in [her] private part," she could feel something wet. (Ex. D at 42-43.)

11 The evidence presented at trial could permit the jury to find more than one count of rape,
12 especially in light of the California definition of sexual penetration that encompasses any
13 contact with external female genitalia. *See Quintana*, 89 Cal. App. 4th at 1366-69. Dr. Ritter's
14 testimony regarding the well-healed penetration injury, when combined with Sandy's testimony
15 that Petitioner had put his penis on her genitals the prior week, is sufficient to support two
16 counts of penetration when the evidence is viewed in the light most favorable to the
17 prosecution. In addition, the entirety of Sandy's testimony, though at times equivocal and
18 vague, indicates that there were multiple instances of contact between Sandy's genitals and
19 Petitioner's penis.[2] Because the evidence in the record, when viewed in the light most favorable
20 to the prosecution, is sufficient to support a finding of more than one instance of penetration as
21 defined by state law, the evidence supports the jury's finding of guilt on two counts of rape.
22 The California Court of Appeal held that the evidence was sufficient to support the jury's
23 finding of two counts of rape, and because this holding was not "based on an unreasonable
24 determination of the facts in light of the evidence presented in the State court proceeding," this

---

[2] Throughout Sandy's interviews and testimony at trial, both male and female genitalia are referred to as "privates." Presumably, Sandy's "front private" refers to the entirety of her external female genitalia, and her "back private" refers to her anus. When describing the contact, Sandy specified whether the contact with her "privates" occurred on the "inside" or "outside," the "top" the "bottom," the "front" or "back," or in the "middle."

14

1   Court affirms the decision.  28 U.S.C. § 2254(d)(2).

2       **2.    The Evidence Was Sufficient to Support the Jury's Finding of One Count of Sodomy.**

4   In addition to contesting the sufficiency of evidence for more than one count of rape, Petitioner contends that there is insufficient evidence to support his conviction on one count of aggravated sexual assault committed by sodomy.  California law defines sodomy as "sexual conduct consisting of contact between the penis of one person and the anus of another."  Cal. Penal Code § 286(a).  As with rape, "any sexual penetration, however slight" is sufficient to support the conviction.  *Id.*  Under California law, sodomy does not require skin-on-skin contact, and a sodomy conviction can be supported even where the contact occurs through clothing.  *People v. Ribera*, 133 Cal. App. 4th 81, 85 (2005).

12  At trial, the jury heard testimony from Sandy related to the allegations of sodomy.  In her interview with Tran, Sandy described contact "in the middle ... [of her] butt."  (Ex. D at 24.)  In the preliminary examination, which was read to the jury, Sandy stated that Petitioner did the "same thing that he did on the front," and that he pushed his penis in.  (Ex. F at 610.)  Furthermore, at the preliminary hearing, Sandy stated that when Petitioner pushed his penis into the middle of her behind, there was skin-on-skin contact.  (*Id.*)  However, Sandy immediately backtracked and stated that the contact occurred outside her clothing.  (*Id.*)

19  The evidence presented at trial, when viewed in the light most favorable to the prosecution, supports the jury's finding of sodomy.  Given the medical evidence in support of rape, Sandy's statement that Petitioner "did the same thing" to her behind as he did to her vagina could support the jury's conclusion.  In addition, because skin-on-skin contact is not required under *Ribera*, the jury could find sufficient evidence of sodomy even if they believed that the contact occurred outside Sandy's clothing.  *See Ribera*, 133 Cal. App. 4th at 85.  Because the California Court of Appeal reasonably determined that the evidence was sufficient for a rational trier of fact to have found the elements of sodomy beyond a reasonable doubt, this Court affirms the decision.

**C.    The Trial Court's Admission of Excerpts from the Preliminary Hearing Did Not**

**Render the Conviction Unfair.**

Petitioner argues that admission of testimony from the preliminary hearing violated his Sixth and Fourteenth Amendment rights to confrontation, fair trial, and a reliable guilt determination. Specifically, Petitioner objects to the admission of the question, "When Mike tried to put his private part into your front private part, did it ever touch the skin of your private part?" as well as Sandy's answer, "Two times." (Petition at ¶ 82.)

Because the California Court of Appeal only considered state law, this Court must determine whether the state court's application of state law contravenes clearly established federal law. 28 U.S.C. § 2254(d)(1); *Lockhart*, 250 F.3d at 1230. Under clearly established federal law, "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991). Instead, this Court reviews the state court's application of state law through the lense of Constitutional law, and will grant habeas relief only if the admission of challenged evidence is so prejudicial it renders the conviction unfair. *Id.* at 67-68 (holding that the improper admission of prior injury evidence, where petitioner was charged with murdering an infant but was not linked to the prior injury, and where the defense did not claim that the child's death was accidental, was probative of intent and therefore did not render the conviction unfair); *see also Rupe v. Wood*, 93 F.3d 1434, 1444 (9th Cir. 1996) (finding that improper admission of evidence about petitioner's gun collection did not render the penalty phase of the trial fundamentally unfair because other evidence weighed against petitioner). Improper admission of evidence violates due process and renders a conviction unfair "[o]nly if there are *no* permissible inferences the jury may draw from the evidence." *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991) (emphasis in original) (finding the improper admission of evidence that petitioner had $135,000 dollars in the trunk of his car at the time of arrest did not render the trial fundamentally unfair because it allowed the jury to make the permissible inference that another large amount of money found earlier in petitioner's trunk also belonged to him).

In this case, the admission of the testimony elicited by a leading question violates due

16

process only if there are no permissible inferences that may be drawn from the evidence, thus rendering Petitioner's conviction based on that evidence fundamentally unfair. *See id.* The question, "When Mike tried to put his private part into your front private part, did it ever touch the skin of your private part?" as well as Sandy's answer, "Two times," could allow the jury to make several permissible inferences. The jury could permissibly infer that the testimony was evidence that the skin of Petitioner's penis touched the skin of Sandy's genitals two times. The jury could also permissibly infer that Petitioner tried to rape Sandy two times. In addition, even without the challenged testimony, other evidence in the record demonstrates that Petitioner had inappropriate contact with Sandy. Sandy testified that Petitioner touched her with his penis more than one time, Sandy told detective Tran that the last time Petitioner's penis touched her was the week before her medical exam, and the medical exam showed a well-healed hymenal tear. (Ex. B at 8; Ex. D at 24-26, 36; Ex. F at 363.)

The challenged testimony did not render Petitioner's trial fundamentally unfair. The challenged testimony enabled the jury to draw permissible inferences, and even without the testimony, the other evidence in the record supports the jury's finding of guilt on two counts of rape. Because the admission of the preliminary hearing testimony does not render Petitioner's conviction fundamentally unfair in violation of due process, this Court affirms the Court of Appeal's denial of relief as not contrary to clearly established federal law.

**D.     The Prosecutor's Conduct During Closing Arguments Did Not Render the Conviction Unfair.**

Petitioner argues that the prosecution's closing arguments exposed the jury to facts not in evidence, making the prosecutor an unsworn witness against the Petitioner, and denying him his Sixth Amendment right to confrontation and cross-examination. At trial, defense counsel delivered the first closing statement, arguing that Sandy's allegations of rape were tainted by the investigative process. (Ex. F at 708.) Specifically, the defense argued that Detective Tran's flawed questioning strategy caused Sandy to make new allegations about rape that she had not made originally. (*Id.*) The defense stated, "It was Detective Tran that said it, and then piggy-backed on it, she gave him what he wanted, and then he kept asking questions." (*Id.*) After the

17

defense's closing statement, the prosecutor argued in closing that the jury should be careful about concluding that Sandy's rape allegations were the product of coercive questioning. (*Id.* at 717-19.) The prosecution pointed to the fact that, when cross-examining the people with whom Sandy first spoke, Ms. Baines, the church employee, and Officer Thompson, the defense never asked a question like, "Isn't it true that [Sandy] never said she was raped by the defendant?" (*Id.* at 718.) The prosecutor argued that if Sandy had not told Ms. Baines or Officer Thompson that she had been raped, the defense would have asked questions on cross-examination to elicit that information. (*Id.* at 719.) Petitioner contends that these arguments, made by the prosecution in closing, violated his due process rights.

A defendant's due process rights are violated when a prosecutor's misconduct renders a trial fundamentally unfair. *See Darden v. Wainwright*, 477 U.S. 168, 182-83 (1986); *Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor"). A prosecutor's comments during trial violate due process only when, examined in the context of the proceedings as a whole, they infect the trial with unfairness. *United States v. Young*, 470 U.S. 1, 16 (1985) ("Viewed in context, the prosecutor's statements, although inappropriate and amounting to error, were not such as to undermine the fundamental fairness of the trial and contribute to a miscarriage of justice."); *Johnson v. Sublett*, 63 F.3d 926, 929 (9th Cir. 1995) ("This court ... examinin[es] the entire proceedings to determine whether the prosecutor's remarks so infected the trial with unfairness as to make the resulting conviction a denial of due process.") (citation and internal quotation marks omitted). In the context of the entire trial, a prosecutor's closing argument is unlikely to infect the trial with unfairness where the argument is responsive to the preceding closing argument, where the argument does not misstate or misrepresent the evidence, and where the court reminds jurors that closing arguments are not evidence upon which a conviction should be based. *Darden*, 477 U.S. at 181-82. In the context of closing arguments, courts allow prosecutors wide latitude to draw reasonable inferences from the evidence. *United States v. Atcheson*, 94 F.3d 1237, 1244 (9th Cir. 1996). A reviewing court should not interpret a closing argument as having "its most damaging meaning," nor should it

18

1   presume that "a jury ... will draw that meaning from the plethora of less damaging
2   interpretations." *Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974).

3         Here, the petitioner's closing argument was responsive to the preceding closing
4   argument, did not misstate or misrepresent the evidence, and the court reminded the jurors that
5   closing arguments are not evidence. (Ex. F at 717-720.) First, the prosecutor's closing
6   argument was responsive to the defense. In closing, the defense argued that Detective Tran's
7   improper questioning caused Sandy to distort the truth and make false statements about rape.
8   (*Id.* at 708.) In response, the prosecutor argued that if Sandy had denied being raped or had
9   given her early interviewers a different version of the events, the defense would have elicited
10  that information on cross-examination. (*Id.* at 719.) Second, the prosecutor's argument did not
11  misstate or misrepresent the evidence. The prosecutor did not state that Sandy told Officer
12  Thompson or Ms. Baines, the church employee, that she had been raped, nor did the prosecutor
13  suggest what Sandy may have told them. The prosecutor only argued that the jury should be
14  careful about the conclusions they draw from the evidence "because you don't have the
15  evidence before you of those conversations with Baines and Thompson to make that factual
16  finding." (*Id.*) Finally, the trial court reminded the jury that closing arguments are not
17  evidence, and that "[t]he jury will be very aware of ... their responsibility to only base their
18  decision upon the evidence that you've been presented with and the reasonable inferences that
19  can be drawn therefrom." (*Id.* at 720.)

20        The California Court of Appeal found that the prosecutor's closing argument did not
21  amount to misconduct, and under AEDPA, this court may grant habeas relief only if this finding
22  is objectively unreasonable. *See* 28 U.S.C. § 2254(d). The Court of Appeal found that:

> The prosecutor's comment was fairly responsive to defense counsel's "snowball" argument that the jury should infer that Sandy had not complained about intercourse until Tran contaminated and influenced her during their interview. The prosecutor noted that defense counsel had asked Tuyet whether Sandy had complained about intercourse before the Tran interview, and had received a negative answer, but had not asked other witnesses the same question. This is comparable to a comment on the defense's failure to call logical witnesses or introduce material evidence, which is not misconduct. (*People v. Miller* (1990) 50 Cal.3d 954, 996.) Taken in context, the prosecutor's reference to the rules of evidence did not inform the jury that Sandy had told both Baines and Thompson that she was raped. Rather, it served as a reference point for an

argument about the strength of the inference that defense counsel was asking the jury to make based on what evidence the defense presented considered in light of the defense's failure to elicit supporting evidence from other witnesses. This was not misconduct.

*Nguyen*, No. H030366, slip op. at 32. The California Court of Appeal's finding is not objectively unreasonable because the prosecutor's closing argument did not violate due process. The prosecutor's argument was responsive to the closing arguments of the defense, it did not misrepresent the evidence, and the jurors were reminded to base their decision on the evidence, not the argument. As a result, this Court affirms the decision.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED. The Clerk shall enter judgment in favor of Respondent and close the file.

**IT IS SO ORDERED.**

Dated: March 13, 2012

JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE